IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COLETTE JENKINS,

Plaintiff,

-vs-

LL ATLANTA, LLC'S d/b/a OPERA
NIGHTCLUB                           CASE NO.:  1:14-CV-2791
and MGAGE, LLC,

Defendants.

_____/

## **MOTION FOR SUMMARY JUDGMENT**

Plaintiff, COLETTE JENKINS, by and through her undersigned counsel and pursuant to Fed. R. Civ. P. 56(a), hereby moves this Court for summary judgment in her favor against Defendants, LL ATLANTA, LLC'S d/b/a OPERA NIGHTCLUB (hereinafter "Opera") and MGAGE, LLC (hereinafter "mGage"), as follows:

I.     **Factual Background**

1.     On September 26, 2016, an unknown person, presumably with the cell phone number (404)207-2763, opted-in to receiving text messages from Defendants, by texting the word "College" from his/her cell phone to Defendants. (Depo. Scholl, p. 47, l. 20; Scholl Dep. Ex. 5).   Thereafter, Defendants began sending promotional text messages to the cellular telephone number (404)207-

2763 over the period of September 26, 2012 through July 2, 2014. (Depo. Scholl, pp. 49, 53-55, and 69-70; Scholl Depo. Exs. 3-5).

2.   On April 19, 2013, the Plaintiff activated her cell phone with MetroPCS, and was assigned the cell phone number (404)207-2763.   (Depo. Jenkins, pp. 58-60; Jenkins Depo. Ex. 1; see also MetropPCS subscriber record).

3.   At all times since April 19, 2013, Plaintiff has been the sole subscriber, regular user and carrier of the cell phone with the cell phone number (404)207-2763.   (Depo. Jenkins, p. 37, l. 1-4 & 19-21).   When she activated her phone, which was a new cell phone, she believed her assigned cell phone number was also a new cell phone number.  (Depo. Jenkins, p. 46, l. 1-2)

4.   Over the period of April 19, 2013 through July 2, 2014, Defendants sent a total of 149 text messages to Plaintiff's cell phone number.  (Depo. Scholl, pp. 49, 53-55, and 69-70; Scholl Depo. Exs. 3-5; Depo. Jenkins, p. 7, l. 17-23 & 55).

5.   Plaintiff has never given her prior express consent to Defendants to receive text messages to her cell phone number.  (Depo. Jenkins, p. 49, l. 19-23).

6.   After activating her MetroPCS cell phone and after receiving numerous text messages from Defendants to her new cell phone (ie. approximately 21 text messages), on August 28, 2013 Plaintiff sent a reply text message to

Defendants asking Defendants to "*Please stop all messages To my phone, and I do thank you. Have a bless day.*" (Depo. Scholl, p. 63, l. 15-25; Scholl Depo. Ex. 3). This was the first of seventeen reply text messages sent by Plaintiff from her cell phone to Defendants to try to get Defendants to stop sending text messages to her phone. (Opera's 12/16/14 Answers to Plaintiff's RFA's, #9).

     7.    The dates, times, and content of all reply text messages sent by Plaintiff to Defendants to try to get their text messages to her phone to stop are as follows:

    1.    8/28/13 @ 15.26.00 – "Please stop all messages To my phone, and I do thank you. Have a bless day."

    2.    8/30/13 @ 13:20:13 – "Please delete me from your system, please sent No more text to my phone, and I do thank you. Have A BLESS Day knowing JESUS Loves YOU."

    3.    8/31/13 @ 12:04:06 – "Please delete me from your system, please sent No more text to my phone, and I do thank you. Have A BLESS Day knowing JESUS Loves YOU."

    4.    9/6/13 @ 12:10:46 – "I have very kindly asked To delete my phone # from website. Please stop All messages ..."

    5.    9/22/13 @ 10:46:30 – "Please stop all messages, Delete me off your site. Please take care of this Matter, and stop blowing Up my phone. I'm Not a website person..."

    6.    10/16/13 @ 14:35:02 – "Please stop all messages, Delete me off your site. Please take care of this Matter, and stop blowing Up my phone. I'm Not a website person..."

    7.    10/16:13 @ 14:36:57 – "Please stop all messages, Delete me off your site. Please take care of this Matter, and stop blowing Up my phone. I'm Not a website person..."

    8.    10/31/13 @ 10:54:12 – "Please stop all messages, Delete me off your site. Please take care of this Matter, and stop blowing Up my phone. I'm Not a website person..."

9.    11/14/13 @ 23:29:12 – "Please stop all messages, Delete me off your site. Please take care of this Matter, and stop blowing Up my phone. I'm Not a website person..."

10.    11/20/13 @ 14:42:55 – "PLEASE STOP TEXTING MY PHONE. I HAVE ASKED YOU TIME AND TIME AGAIN TO DELETE MY…"

11.    11/20/13 @ 14:46:56 – "Please stop all messages, Delete me off your site. Please take care of this Matter, and stop blowing Up my phone. I'm Not a website person..."

12    1/3/14 @ 13:14:26 – "Please stop all messages, Delete me off your site. Please take care of this Matter, and stop blowing Up my phone. I'm Not a website person..."

13.    1/3/14 @ 13:19:11 – Please delete me from your system, please sent No more text to my phone, and I do thank you.  Have a BLESS Day knowing JESUS Loves You."

14.    1/18/14 @ 12:35:58 – "I HAVE ASKED YOU (YOUR CLUB WEBSITE) AGAIN AND AGAIN TO STOP ALL MESSAGES, AND DELETE ME OR WHATEVER INFOR. YOU TO STOP TEXTING MY PHONE.  I AM NOT A CLUB GOING PERSON.  I HAVE REQUEST-ED AT LEAST TEN TIMES OR MORE TO STOP ALL MESSAGES I HAVE REQUESTED AGAIN AND AGAIN TO STOP ALL TEXTS MESSAGES … AND YOU GUYS ARE STILL TEXTING ME.  NOW I A LAWYER TO HELP ME WITH THIS."

15.    2/26/14 @ 13:26:10 – "I AM NOT A CLUB GOING PERSON.  I HAVE REQUEST-ED AT LEAST TEN TIMES OR MORE TO STOP ALL MESSAGES I HAVE REQUESTED AGAIN AND AGAIN TO STOP ALL TEXTS MESSAGES …"

16.    6/25/14 @ 17:06:09 – "I HAVE REQUESTED AGAIN AND AGAIN TO STOP ALL TEXTS MESSAGES … AND YOU GUYS ARE STILL TEXTING ME.  NOW I A LAWYER TO HELP ME WITH THIS."

17.    7/2/14 @ 14:33:54 – "STOP"

(Scholl Depo. Exs. 3, 4 & 5).

8.    Of the 149 total text messages sent to her cell phone, 128 of those text messages came after August 28, 2013, when Plaintiff first asked Defendants to stop sending text messages to her cell phone.  (Scholl Depo. Exs. 3, 4 & 5).

9.    The first time any of Defendants text messages gave her any instruction whatsoever as to what she had to get the messages to stop was on May 27, 2014, when the messages started including the language "*Reply STOP to end.*" (Depo. Scholl, p. 72, l. 17-25 and p. 73, l. 1-10).

10.    Defendant, Opera, hired Defendant, mGage, to provide a platform that would route SMS text messages through connections mGage has to cell phone carriers to ultimate delivery to end cell phone users.  (Depo. Scholl, pp. 7 &10; Green Depo. p. 24, l. 12-14; Green Depo., p. 13, l. 8-24).  Ultimate delivery to a large group of cell phone numbers at the same time.  (Depo. Green, p. 69, l. 17-20).

11.    An SMS text message is a text-based message which is processed by a mobile phone via a SMS application.  (Depo. Scholl, p. 10, l. 17-19).

12.    MGage provides the "platform" by way of a web-based software program, that allows its clients, like Opera, to disseminate its promotional text messages to large groups of cell phone numbers.  (Depo. Scholl, pp. 11-12).

13.    Since 2010, mGage handled, exclusively, for Opera the platform for delivery of "Application-to-Peer" (or A2P) text messages, which were SMS text messages from a business for ultimate receipt by an end cell phone user.  (Depo. Scholl, p. 13, l. 1-7 & 21-23).

14.    MGage's platform is an internet gateway which connected Opera to cell phone carriers, for ultimate routing of SMS text messages to large numbers of end cell phone users.  (Depo. Scholl, p. 14, l. 2-7; p. 16, l. 16-24).  mGage's platform can process over 5 billion messages per month, and the number of recipients is most likely in the hundreds of millions.  (Depo. Scholl, p. 60, l. 6-21).  The number of recipients of text messages as part of the platform that delivered Opera's messages was more than 10,000, and perhaps up to 50,000.  (Depo. Scholl, p. 62, l. 19-22; p. 63, l. 13; p. 82, l. 14-21; Depo. Green, p. 23, l. 1-6).

15.    MGage provided Opera with its web-based platform whereby Opera could upload message content into the platform and also determine to whom the messages would be sent.  (Depo. Scholl, p. 16, l. 16-24; Depo. Green, p. 18, l 5-24).

16.    The content of each SMS text message (ie. what the message would say) was exclusively the responsibility of Defendant, Opera.  (Depo. Scholl, p. 18, l. 14-16; Green depo., p. 20, l. 6-9).

17.    However, once the content was determined, the message would be keyed, by Opera, into mGage's web-based tool for ultimate delivery to end cell phone users.  (Depo. Scholl, p. 18, l. 21-25; p. 19, l.1).   The text messages

campaign could send more than one text message a day, and could be scheduled a few hours in advance. (Depo. Green, p. 23, l. 23-25; p. 24, l. 1-4).

18.    Opera was required, under its agreement with mGage, to make sure that it had acquired the consent of each individual to whom text messages would be sent.  (Depo. Scholl, p. 19, l. 17-20; p. 28, l. 3-17; Depo. Green, p. 26, l. 6-14). mGage expected Opera, pursuant to its contractual arrangement, to obtain such "Third Party consents" in writing, because that was a standard in the industry. (Depo. Scholl, p. 28, l. 18-21).

19.    The list cell phone numbers that would be sent these SMS text were uploaded by Opera onto the web-based platform by way of a CSV file.  (Depo. Scholl, p. 19, l. 8-16; Depo. Gree, p. 22, l. 4-14).  It was up to Opera to upload that CSV file/list of cell phone numbers onto mGage's platform; additionally, as to cell phone users that would "opt-in" to receiving text messages, Opera would add those cell phone numbers to that master CSV file/list of cell phone number that would receive text messages.  (Depo. Scholl, p. 19, l. 8-16 & 21-25; p. 20, l. 1-5).  Opera determined which telephone numbers would be sent text messages.  (Depo. Green, p. 20, l. 13-16).

20.    The CSV file is uploaded, by Opera, to mGage's web-based tool. (Depo. Scholl, p. 21, l. 1-5; Depo. Green, p. 22, l. 8-14).  The CSV file stored the

cell phone numbers to which text messages are to be sent. (Depo. Scholl, p. 21-23). Cell phone numbers would remain stored in the CSV file until they are removed. (Depo. Scholl, p. 23, l. 16-19; Depo. Green, p. 22, l. 12-14). MGage would simply hold that CSV file in memory, for Opera, and then Opera could reference that file and use the platform to send text messages to the numbers in the CSV file. (Depo. Scholl, p. 76, l. 19-25).

21.    The "human involvement" with respect to the platform that ultimately delivered text messages to Plaintiff's cell phone was limited to: (a) specify the recipient of the content; and (b) determine the content of the message itself. (Depo. Scholl, p. 61, l. 2-9).

22.    It was the responsibility of Opera to monitor any reply text messages asking for messages to stop and to remove any cell phone numbers that did not want to receive such text messages. (Depo. Scholl, p. 23, l. 3-15 & 20-22).

23.    Pursuant to its contractual arrangement, mGage expected Opera to be compliant with all regulatory aspects of the Telephone Consumer Protection Act ("TCPA"). (Depo. Scholl, p. 26, l. 19-23; p. 27, l. 16-24).

24.    In the event that a cell phone number is reassigned from one end user to another, mGage would typically rely upon the cell phone carriers it had contracts with to notify mGage that a cell phone number was deactivated and/or

reassigned.  (Depo. Scholl, p. 29, l. 9-25; p. 30, l. 7).  mGage would then pass that

information on it its customers so that numbers could be removed from their lists.

(Depo. Scholl, p. 30, l. 5-7).  However, not all cell phone carriers are required

follow the protocol of notifying mGage of when a cell phone number is reassigned

and/or deactivated.  (Depo. Scholl, p. 30, l. 8-11).  Defendants do not know if

Plaintiff's cell phone carrier, MetroPCS, is one of those cell phone carriers that

notifies mGage of numbers that are changed and/or reassigned.  (Depo. Scholl, p.

31, l. 1-4).

     25.    mGage expected Opera to followthe "CTIA Short Code Montitoring

Program" (Depo. Scholl, p. 31, l. 5-15; p. 32, l. 1-6; Scholl Depo. Ex. 7).  This

particular handbook references the TCPA.  (Depo. Scholl, p. 33, l. 16-25; p. 34, l.

1).

     26.    MGage also expected Opera to follow the "Mobile Marketing

Association, U.S. Consumer Best Practices for Messaging published October 16,

2012.  (Depo. Scholl, p. 41, l. 21-25; p. 42, l. 1-15).  This manual also references

the TCPA.  (Depo. Scholl, p. 42, l. 21-24; Scholl Depo. Ex. 6).

     27.    The messages that were ultimately sent to Plaintiff's cell phone

number were required to contain opt-out instructions, because they were part of a

marketing program which had repeated messages going through them.  (Depo.

Scholl, p. 34, l. 17-25; p. 25, l. 1-4).  These text messages were considered a "short code program" and such programs were required to "… respond to, at a minimum, the universal key words Stop, End, Cancel, Unsubscribe, and Quit by sending an opt-out message, and if the user is subscribed, by opting the user out of the program." (Depo. Scholl, p. 35, l. 9-25; p. 36, l. 1-7).

28.    It was the responsibility of Opera to set up the parameters within mGage's messaging platform to program how the platform would respond to a reply text message received back from an end cell phone user.  (Depo. Scholl, p. 37 & p. 38, l. 1-4).   It was the responsibility of mGage to clearly spell out, within the content of each message, instructions on how to get the text messages to stop. (Depo. Scholl, p. 39, l. 3-18).

29.    The reason none of the text messages sent to Plaintiff's cell phone number before May 27, 2014 contained any opt-out instructions or information was because Opera did not include any opt-out procedures in the body of the text messages.  (Depo. Scholl, p. 52, l. 9-15; Depo. Green, p. 38, l. 11-15).  Opera believed that mGage would add that required language to the body of each text, because that is how Opera's previous text messaging company would do it.  (Green Depo., p. 32, l. 2-5).

30.    The platform that ultimately delivered text messages to many cell phone numbers, including Plaintiff's, was never configured (either by mGage or Opera) to respond to reply text messages that did not contain one of the key words as the very first word in the reply.  (Depo. Scholl, p. 65, l. 21-22).

31.    mGage could have offered Opera a platform that would have searched through the content of any reply text messages for keywords such as "stop", etc., but it did not.  (Depo. Scholl, p. 74, l. 21-25; p. 75, l. 1-7).

32.    mGage gave Opera only basic instructions, however, on how to compose and send SMS messages via mGage's platform.  (Depo. Green, p. 16, l. 20-25).

33.    Opera never had any person or group of persons monitor any of the reply text messages that would come back from end cell phone users.  (Depo. Green, p. 33, l. 20-23).  Opera contends that mGage never showed Opera any reply text message lists where end cell phone users had requested such messages stop. (Depo. Green, p. 52, l. 16-21).

34.    Some of Defendants' text messages were offensive to Plaintiff, sexual in nature, and detailing events concerning bikinis, alcohol consumption, "pantyraids", twerking, "Tropic Beauty Models," "#BADSANTA's Wild Xmas

Party," ".. a Juicy Twerkodd @ OperaWednesdays," "#OperaSecrets Lingerie Party tonight…," etc.  (Scholl Depo. Exs. 3, 4 & 5; Depo. Jenkins, pp. 118-119).

## II.    <u>Legal Standard</u>

Under Fed. R. Civ. P. 56(a), summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 *1986) and *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).  A genuine issue exists on if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248.  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)(emphasis in original).

Once a party makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986).   The evidence must be significantly probative to support the claims.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-249 (1986).  However, there must be a conflict in substantial evidence to pose a jury question.  *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989).

### III.    <u>Argument and Citation of Authority</u>

This motion involves a very simple, narrow legal issue.  The Defendants sent numerous SMS text messages to Plaintiff's cellular telephone using an automatic telephone dialing without the prior express consent of the Plaintiff, the called party, in violation of the TCPA, 47 U.S.C. § 227(b)(1(A)(iii). Consequently, Plaintiff is entitled as a matter of law to summary judgment as to the Defendants' liability under the TCPA, and for damages based on 149 text message sent to her cell phone without her prior express consent.

A.    *The TCPA*

The TCPA prohibits making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone[.]"   47 U.S.C. § 227(b)(1)(A)(iii).  A text message to a cellular telephone qualifies as a call within

the meaning of the TCPA.  47 U.S.C. § 227(b)(1)(A)(iii); *In the matter of Rules &*

*Regulations Implementing the TCPA of 1991,* FCC 15-72, ¶ 107, *Declaratory*

*Ruling & Order*, Released July 10, 2015 (hereinafter 2015 FCC Order); *Legg v.*

*Voice Media Group, Inc.*, 20 F. Supp. 3d 1370 (S.D. Fla. May 16, 2014); G*ager v.*

*Dell Fin. Servs.*, 727 F.3d 265, 269 n. 2 (3rd Cir. 2013).  Enforcement of this rule is

assured through a private right of action created by the TCPA, which provides that

a person may bring "an action to recover for actual monetary loss for such

violation, or to receive $500 in damages for each such violation, whichever is

greater[.]"  47 U.S.C. § 227(b)(3)(B).  In addition, "[i]f the court finds that the

defendant willfully or knowingly violated this subsection or the regulations

prescribed under this subsection, the court may, in its discretion, increase the

amount of the award to an amount equal to not more than 3 times the amount

available under subparagraph (B) of this paragraph."  47 U.S.C. § 227(b)(3)(C).

There is no dispute that Defendant sent numerous, non-emergency, text

messages using an automated telephone dialing system to the cellular telephone of

Plaintiff; the subscriber, called party, owner and regular user of the cellular

telephone in question.  See *Osorio v. State Farm Bank, F.S.B.,* 746 F. 3d 1242 (11th

Cir. 2014); *Breslow v. Wells Fargo Bank, N.A.*, --- F.3d ---, No. 12-14564, D.C.

Docket No. 1:11-cv-22681-RNS (11th Cir. June 5, 2014);  *Breslow v. Wells Fargo*

*Bank, N.A.*, 857 F.Supp.2d 1316 (S.D. Fla. 2012), *Soppet v. Enhanced Recovery Co.*, 2011 WL 3704681 (N.D. Ill. 2011); *Swope v. Credit Management, LP,* 2013 WL 607830 (E.D. Mo. Feb. 19, 2013); *Page v. Regions Bank*, --- F.Supp.2d ---, 2012 WL 6913593 (N.D. Ala. Aug. 22, 2012).

  B. *The Lack of Plaintiff's Prior Express Consent*

  While Defendants have raised numerous affirmatives defenses their respective Answers to [Doc. 11] Plaintiff's Amended Complaint, the only defenses to a violation of the TCPA is "prior express consent" or if the calls were made for "emergency purposes."   47 U.S.C.  § 227(b)(1)(A)(iii).   Defendant has admitted that none of its calls were made for "emergency purposes."   As for "prior express consent," where a person first provides her or his express consent to receive telephone calls on a cellular telephone number, a caller may raise this defense to a charge of violating the TCPA.   However, upon revocation of this prior express consent, this defense nor longer available to Defendant.   *Osorio v. State Farm Bank, F.S.B.,* --- F.3d. ---, 2014 WL 1258023 (11th Cir. 2014); see also, *In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 564-65, 2008 WL 65485 (Jan. 4, 2008).

  Here, Plaintiff never provided her consent to Defendants to receive text messages to her cell phone, ever.   Defendants' alleged consent was obtained by a

prior user of a phone, and many months before Plaintiff was assigned her cell phone number by MetroPCS.   Accordingly, this defense is not available to Defendants for any of the text messages it sent to Plaintiff's cell phone number. Additionally, Plaintiff repeatedly told (by way of reply text messages) Defendants to stop texting her phone.   Reply text messages that were simply ignored by Defendants.   Accordingly, any alleged "prior express consent" that Defendants claim they had, was repeatedly revoked by Plaintiff; and revoked in writing. *Gager v. Dell Financial Services, LLC*, 727 F.3d 265, 268–272 (3d Cir. 2013); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014); See *2015 FCC Order,* FCC 15-72, ¶¶ 55-70, July 10, 2015.

C.     *Defendants' Text Messaging System is an ATDS*

The TCPA gives the Federal Communications Commission ("FCC") the authority to prescribe regulations and implement the TCPA's provisions.   47 U.S.C. § 227(b)(2).   In 2003, the FCC adopted rules addressing the technological advances made by the telemarketing industry. *See In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order,* 18 F.C.C. Rcd. 14014, 14017 ¶¶ 1–2, 2003 WL 21517853 (F.C.C. July 3, 2003) (*"2003 Report"* ). The FCC sought to ensure that consumers continued to receive the protection from unwanted solicitation calls that Congress intended in enacting

the TCPA. *2003 Report* at 14017 ¶ 2.   As an example, and recognizing the proliferation of predictive dialer use in telemarketing, the FCC in 2002 had invited comments on whether predictive dialers fall within the restrictions placed on ATDS's. *See 2003 Report* at 14090 ¶ 129. A predictive dialer is defined as "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls." *2003 Report* at 14091 ¶ 131. Moreover, "[t]he hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, *or from a database of numbers." 2003 Report* at 14091 ¶ 131 (emphasis added).  The FCC acknowledged that the "basic function" remained the same—namely, "the *capacity* to dial [phone] numbers [en masse] without human intervention" or oversight. *2003 Report* at 14092 ¶ 132.

Also in its 2003 Order, the FCC concluded that consent must be obtained for SMS calls (or "text messages") to wireless numbers.  *2003 Report* at 114115, ¶ 165; 2015 FCC Order at ¶¶ 107 & 110; see also *Satterfield v. Simon & Shuster, Inc.*, 569 F.3d 946 (9th Cir. 2009)(noting that text messaging is a form of communication used primarily between telephones and is therefore consistent with the definition of a "call"). The FCC determined, in its 2015 FCC Order, that  "by… entering a message on a web portal to be sent to a consumer's wireless telephone

number and send a text message to the consumer's wireless telephone number, the equipment dials a telephone number and the user of such technology thereby makes a telephone call to a number assigned to a wireless service as contemplated in section 227(b)(1) of the Act." 2015 FCC Order, FCC 15-72, ¶ 114, July 10, 2015. In *Sterk v. Path*, 2014 WL 2443785, at *4-5 (N. D. Ill. May 30, 2014, the court granted partial summary judgment in favor of plaintiff on whether a text was sent with an ATDS.

As addressed in its recent 2015 FCC Order, when the equipment used to send SMS text messages, like Defendants' here, must necessarily store, or at least have the capacity to store, large volumes of numbers to be called, it meets the first element of the autodialer definition. 2015 FCC Order at ¶ 111. Here, Defendants' equipment not only had the capacity, but it actually did house or store, large volumes of numbers to be sent SMS text messages (between 10,000 and 50,000). As stated by the FCC, "so long as the initiating device has the requisite capacity to meet the statutory definition of an autodialer and send a text message, which the Commission has deemed a call, the fact that the message is initiated from a phone versus some other device is not relevant." 2015 FCC Order ¶, fn. 379; see also, 2003 TCPA order, 18 FCC Rcd at 14115, ¶ 165; *Joffe v. Acacia Mortgage Company*, 121 P.3d 831 at 867-7 (Az. Ct. App. 2006), *cert. denied*, 549 U.A. 1111

(2006); Intergovernmental Advisory Committee to the Federal Communications committee, Advisory recommendation No: 2015-6 at ¶ 10 (May 15, 2015).  Even if the equipment does not actually use a random or sequential number generator, but has the capacity to dial numbers, qualifies it as an ATDS.  2015 FCC Order ¶¶ 111-112.  The FCC clearly ruled that " …we clarify that the equipment used to send Internet-to-phone text messages as described by Revolution Messaging is an autodialer under the TCPA."   2015 FCC Order ¶¶ 108-109, fn. 368-370.  Specifically, internet-to-phone text messaging technology enables the sending of messages from a computer to a wireless phone; they are automatically converted by the wireless provider into a text message format that is delivered to the consumer's wireless phone over the wireless provider's network; alternatively, the message enters the wireless provider's network via the carrier's web portal and is then converted to a text message format and delivered to the consumer's wireless phone over the wireless provider's network.    2015 FCC Order ¶¶ 108-109, fn. 368-370.

D. *Defendant, Opera, Initiated the Text Messages and is Liable Under the TCPA*

The intent of Congress, when it established the TCPA in 1991, was to protect consumers from the nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate.  2015 FCC Order ¶ 29.  Congress therefore put the responsibility for compliance with the law directly on the party that "makes" or "initiates" the call.  2015 FCC Order ¶ 29.  Here, Defendants have pointed the finger at each other in this regard.

In attempting to provide guidance as to who "makes" or initiates" the call/text message, the FCC ruled that the totality of facts and circumstances surrounding the placing of a particular call to determine:  (1)  who took the steps necessary to physically place the call; (2)  whether any person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA.  2015 FCC Order ¶ 30.  Who controlled the content of the text message is also a factor to be considered.  2015 FCC Order ¶ 37.  Here, Opera exclusively controlled the content of each text message.  Opera's representatives would determine not only the content, but would use the web-based interface to decide what, when and to who its promotional text messages would be sent.  Opera controlled to whom text messages would be sent.  Opera had the

responsibility to remove cell phone numbers from its stored list of numbers so that those who did not want to receive text messages, would not receive them.  Opera also controlled when the text messages would be sent.  Accordingly, Opera was the maker and/or initiator of the text messages sent to Plaintiff's cell phone, and is liable to Plaintiff under the TCPA.

E. *Defendant, mGage, Made the Text Messages and is Liable Under the TCPA*

The FCC also stated that whether a person who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes may also be a factor in determining whether the platform provider is so involved in placing the calls as to be deemed to have initiated them. 2015 FCC Order ¶ 30.  There is no dispute here that mGage's web-based platform served as the conduit between what Opera wanted to send, and when, and the cell phone carrier's networks that led to multiple end cell phone users receiving said texts.  Without the platform, no calls could have been made.

Here, mGage had the ability to control or program its platform in any way necessary to meet the goals of its client, Opera.  While both Defendants knew, or should have known, that the text messages sent did not contain any required opt-out language, the messages were disseminated through the platform nonetheless.

Neither mGAge, or Opera, apparently discerned that its messages omitted such required opt-out language, or turned a blind-eye to same.  While mGage did have the responsibility to monitor and report to Opera whether any cell phone carriers notified it of any deactivated and/or reassigned cell phone numbers, it appears that mGage never did and/or Opera never requested such notification.    To date, apparently, mGage does not know if Plaintiff's cell phone carrier, MetroPCS, was a cell phone carrier that did such notifications.

F.   *Damages*

As for the damages awardable to Plaintiff under Count I, enforcement of the TCPA is assured through a private right of action created by the TCPA, which provides that a person may bring "an action to recover for actual monetary loss for such violation, or to receive $500 in damages for each such violation, whichever is greater[.]"   47 U.S.C. § 227(b)(3)(B).   In addition, "[i]f the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph."   47 U.S.C. § 227(b)(3)(C). Accordingly, if the Court determines that Defendant's autodialer calls made after August 28, 2013, (which is the date Plaintiff first made Defendants aware that they

were texting the wrong number, and to stop sending text messages) were made willfully or knowingly by Defendant, then this Court may treble the monetary or statutory damages.  *Harris v. World Financial Network National Bank, et al*., 867 F.Supp.2d 888 (E.D. Mich. April 3, 2012).

Recently, the Eleventh Circuit addressed the issue of "willfully or knowingly" under the TCPA in the matter of *Lary v. Trinity Phys. Fin. & Ins. Services,* 780 F.3d 1101 (11th Cir. 2015).  *Lary* involved a TCPA claim the defendants sent one (or possibly two) unsolicited faxes, and in which a default judgment was obtained by a *pro se* plaintiff.  *Id*. at 1103-4.  The court stated,

> The requirement of "willful[ ] or knowing[ ]" conduct requires the violator to know he was performing the conduct that violates the statute. *Cf. Alea London Ltd. v. Am. Home Servs., Inc.,* 638 F.3d 768, 776 (11th Cir.2011) ("The [Act] does not require any intent for liability except when awarding treble damages."). For example, to violate section 227(b)(1)(A)(i), a defendant must know that he is using an "automatic telephone dialing system" to place a "call," and that the call is directed toward an "emergency" line. *Id.* § 227(b)(1)(A)(i). If we interpreted the statute to require only that the violator knew he was making a "call" or sending a fax, the statute would have almost no room for violations that are *not* "willful [ ] or knowing[ ]." *See Harris v. World Fin. Network Nat'l Bank,* 867 F.Supp.2d 888, 895 (E.D.Mich.2012) ("Such a broad application of 'willful [ ]' or 'knowing' would significantly diminish the statute's distinction between violations that do not require an intent, and those willful[ ] and knowing violations that [C]ongress intended to punish more severely."). *Lary v. Trinity Phys. Fin. & Ins. Services,* 780 F.3d 1101, 1107 (11th Cir. 2015).

Accordingly, as to the 149 total text messages, the minimum damage award to Plaintiff (at $500.00/text) would be $74,500.00. If this Court finds that Defendants' 128 text messages sent after August 28, 2013 (i.e. when Plaintiff first made Defendants' aware that she wanted the texts to stop) were made willfully or knowingly, then the damages awardable to Plaintiff would be $202,500.00 (i.e. $500.00/text for the first 21 sent before August 28, 2013, and $1,500.00/text for the 128 text messages sent after August 28, 2013).

## IV.   CONCLUSION

Based on the foregoing, Plaintiff seeks summary judgment as to liability and damages under the TCPA against Opera or, alternatively, against mGage, and for such other and further relief as appears to this Court to be just and proper in the premises.

Respectfully submitted this 31st day of August, 2015.

/s/  Madeleine N. Simmons
Madeleine N. Simmons, Esquire
GA Bar # 822807
191 Peachtree Street, Suite 4200
P.O. Box 57007
Atlanta, GA 30343
Telephone (404) 965-8811
Fax (404) 965-8812
msimmons@forthepeople.com

and

24

Michael J. Vitoria, Esquire
FL Bar # 0135534
Morgan & Morgan, P.A.
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tele:  (813) 223-5505
mvitoria@ForThePeople.com
Attorneys for Plaintiff

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on 31st day of August, 2015, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following CM/ECF participants: Hayden Pace, Esq., Stokes, Wagner, Hunt, Maretz & Terrell, 3593 Hemphill Street, Atlanta, GA 30337; Peter F. Schoenthaler, Esq., Peter F. Schoenthaler, PC, 3350 Riverwood Parkway, Suite 1900, ATL, GA 30339

                                   /s/ Madeleine N. Simmons
                                    Madeleine N. Simmons, Esquire
                                    GA Bar # 822807
                                    191 Peachtree Street, Suite 4200
                                    P.O. Box 57007
                                    Atlanta, GA 30343
                                    Telephone (404) 965-8811
                                    Fax (404) 965-8812
                                    msimmons@forthepeople.com

                                    and

                                    Michael J. Vitoria, Esquire
                                    FL Bar # 0135534
                                    Morgan & Morgan, P.A.
                                    201 N. Franklin Street, 7th Floor
                                    Tampa, FL 33602
                                    Tele:  (813) 223-5505
                                    mvitoria@ForThePeople.com
                                    Attorneys for Plaintiff