**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

COLLETTE JENKINS

      Plaintiff,

v.

LL ATLANTA, LLC d/b/a OPERA
NIGHT CLUB and MGAGE, LLC,

      Defendants.

Civil Action No.: 1:14-cv-2791

**CORRECTED STATEMENT OF UNDISPUTED MATERIAL FACTS IN
SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OR IN THE ALTERNATIVE,
PARTIAL SUMMARY JUDGMENT
<u>ON INTENTIONALITY</u>**

Defendants mGage, LLC and LL Atlanta, LLC by and through their respective undersigned counsel, hereby submit the following Corrected Statement of Undisputed Material Facts pursuant to L.R. 56.1B(1) in support of its Motion for Summary Judgment.

**<u>UNDISPUTED FACTS</u>**

1.     Plaintiff Collette Jenkins ("Plaintiff" or "Jenkins") is a natural person, and citizen of the State of Georgia residing at 760 Sidney Marcus Boulevard, NE,

Apartment 814, Fulton County Georgia. [Docket No. 11-1; Amended Complaint, ¶ 5; Exhibit A, Deposition of Collette Jenkins pp. 18-19].

2.     Defendant LL Atlanta, LLC d/b/a Opera Nightclub ("Co-Defendant" or "Opera") is a Georgia Limited Liability Company with its principal place of business located at 1150-B Peachtree Street NE, Atlanta, Fulton County, Georgia. [Docket No. 11-1; Amended Complaint, ¶ 6; Docket No. 18, Opera's Amended Answer, ¶ 6].

3.     Defendant mGage, LLC ("Defendant" or "mGage") or is a Delaware Limited Liability company with its principal place of business located at 3424 Peachtree Road NE, Suite 400, Atlanta, Fulton County, Georgia.  [Exhibit B, mGage 2015 Annual Registration with Georgia Secretary of State; Exhibit C, Application for Name Change].

4.     Opera is a nightclub and event center.  [Exhibit D, Deposition of Russell Green, p. 9).

5.     Plaintiff has sued Defendant Opera for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA") ("Count I").  [Docket No. 11-1; Amended Complaint, ¶¶ 32-36].

6.     Plaintiff has sued Defendant mGage for violation of the TCPA ("Count II"). [Docket No. 11-1; Amended Complaint, ¶¶ 37-40].

**mGage's Business**

7.      mGage provides a platform by which a customer, such as Opera, may interact with that platform and send messages to recipients.  [Exhibit E, Deposition of Harvey Scholl, p. 11].

8.      mGage's Advanced Messaging Platform (the "Platform") is its scalable proprietary wireless platform consisting of a core infrastructure and computer programs which perform content routing services via connections with the telephone carriers and with the company's system. [Exhibit F, mGage 0060].

9.      mGage has contractual relationships with the telephone carriers such that it can manage connections to them on behalf of their customers. [Exhibit E, Deposition of Harvey Scholl, p. 11].

10.     Harvey Scholl was the chief operating officer of mGage when he testified as the 30(b)(6) representative of mGage on May 28, 2015.  [Exhibit E, Deposition of Harvey Scholl, p. 6].

11.     As chief operating officer, Harvey Scholl was responsible for the gateway that transmitted text messages to Plaintiff. [Exhibit E, Deposition of Harvey Scholl, p. 7].

**Service Agreement Between Opera and AirWeb.**

12.     On June 30, 2010, Social Study Media, LLC and Air2Web, Inc. ("Air2Web") entered into an Application and Services Agreement (the "Service Agreement").  [Exhibit F, Services Agreement, mGage 0059-78].

13.     It was Opera's working understanding that Opera was a party to the Service Agreement.  [Exhibit D, Deposition of Russell Green, p. 59].

14.     Pursuant to the Service Agreement, Air2Web agreed to provide certain services to Opera including content routing services. [Exhibit F, Services Agreement, mGage 0059-78].

**Assignment and Purchase of the Service Agreement**

15.     On April 24, 2013, Russell Green signed Amendment No. 1 to the Service Agreement ("Service Agreement Amendment") in his capacity as General Manager of Opera. By signing the Service Agreement Amendment, Opera consented to the assignment of the Service Agreement from Air2Web to Velti. [Exhibit D, Deposition of Russell Green, p. 60; Exhibit F, Services Agreement, mGage 0079-80].

16.     Under the Service Agreement Amendment, Air2Web assigned all of its rights and obligations under the Service Agreement to Velti, Inc. ("Velti"). [Exhibit F, Services Agreement, mGage 0079-80].

**Services Provided by mGage Pursuant to the Service Agreement[1]**

17.     Under the Service Agreement, Services means, "The Content Routing Services, Support Services and the Professional Services, collectively." [Exhibit F, Services Agreement, mGage 0061].

18.     Under the Service Agreement, Content Routing Services means, "The services of routing the [Opera's] Content to Carriers via the Advanced Messaging Platform for forwarding on to Subscribers and/or of sending or making available to [Opera] the by Subscribers and received the Advanced Messaging Platform from the Carriers.  [Exhibit F, Services Agreement, mGage 0060].

19.     Under the Service Agreement, Content means " All data, information, and other content in any format (including text and image) either (a) provided by the [Opera] to be sent to Interactive Wireless Devices of Subscribers via the Advanced Messaging Platform or (b) sent to the company by Subscribers.  Content includes SMS.  For purposes of this Agreement, all Content shall be deemed Company's Content for which Company is solely responsible. [Exhibit F, Services Agreement, mGage 0060].

---

[1] Having explained the timeline of changes with regard to party obligated to provide services to Opera under the Service Agreement, all subsequent facts set forth in this statement shall refer to the company obligated to provide its content routing services pursuant to the Service Agreement as mGage regardless of actual company who provided such services on that date.

20.     Under the Service Agreement, Professional Services means, "Consulting and other professional services offer by [mGage] to assist Company during the Term, including in connection with setup, configuration,  custom development (including the Customization Services), campaign execution, short code provisioning, other support required by [Opera] and any other professional services requested by [Opera] or arising out of the business relationship. [mGage] shall provide all such Professional Services on a time-and-materials basis and shall invoice Company as such services are provided.  [Exhibit F, Services Agreement, mGage 0061].

21.     Under the Service Agreement, Support Services means, "Operational technical support services which [mGage] will provide solely to mGage (and not to any Subscriber or Third Party) in connection with the Content Routing Services as set forth in Schedule G [of the Service Agreement].  If [mGage] provides any support services to any Subscriber or other Third Party, then [mGage] shall invoice [Opera] for same at the applicable Professional Services rate. [Exhibit F, Services Agreement, mGage 0061].

22.     mGage was hired to provide its platform to Opera.   [Exhibit E, Deposition of Harvey Scholl, pp. 13-14].

23.     In addition to serving as a gateway that connects to carrier SMSCs, the platform has tools by which human customers can interact with the platform to send messages to cell phones. [Exhibit E, Deposition of Harvey Scholl, p. 14].

24.     mGage would give its customer credentials for mGage's web-based platform by which the customer could load message content and select who the recipients would be. [Exhibit E, Deposition of Harvey Scholl, p. 16, mGage 0061-62].

25.     mGage considered Opera to be a self-service platform user of mGage's platform. [Exhibit E, Deposition of Harvey Scholl, p. 13-14].

26.     Under the Service Agreement, mGage granted Opera a limited, nonexclusive, nontransferable license to use its applications.  Exhibit F, [mGage 0067, Schedule A to the Service Agreement].

27.     Under the Service Agreement, Opera was required to obtain the consent of the individual to whom text messages would be sent. [Exhibit E, Deposition of Harvey Scholl, p. 19].

28.     The mGage platform has no intelligence unless it is configured by a person or by one of mGage's clients. [Exhibit E, Deposition of Harvey Scholl, p. 83].

29.     mGage plays no role in determining who had provided consent to receive text messages from Opera. [Exhibit E, Deposition of Harvey Scholl, p. 22].

30.     Under the Service Agreement, Opera was responsible for monitoring any reply messages sent to Opera's short code. [Exhibit F, Service Agreement; Exhibit E, Deposition of Harvey Scholl, p. 23].

31.     Under the Service Agreement, mGage agreed to send or make available to Opera the content it sent to its subscribers and received by the platform from the Carriers solely through e-mail, posting on the services interface on the platform, or other electronic transmission. [Exhibit F, mGage 0061 and 0069].

32.     Under the Service Agreement, Opera was responsible for determining whether telephone numbers might have been reassigned from or discontinued by a person who initially gave consent and assigned to someone else.   [Exhibit F, Service Agreement; Exhibit E, Deposition of Harvey Scholl, pp. 23-24].

33.     Under the service Agreement, Opera determined how often text messages were sent out. [Exhibit F, Service Agreement; Exhibit E, Deposition of Harvey Scholl, p. 25].

**The Relationship between Opera and mGage**

34.     Under the Service Agreement, Opera represented and warranted that its actions in connection with the Service Agreement would be performed in compliance with all applicable laws, rules and regulations.  [Exhibit F, mGage 0065].

35.     The Service Agreement sets forth the relationship between Opera and mGage, explaining, "Nothing contained in this Agreement shall be construed to create a partnership, agency, joint venture, or employer/employee relationship between the parties.   Neither [mGage nor Opera] has the authority to assume or create any obligation or responsibility, express or implied, on behalf of, or in the name of, the other Party or to bind such other Party in any way. Each Party shall be responsible for wages, taxes, withholding, insurance, hours and conditions of employment of its personnel during the term thereof." [Exhibit F, mGage 0065].

36.     Pursuant to Schedule C of the Service Agreement ("Content Routing Services"), Opera agreed to comply with all applicable laws, rules, regulations, directives, statements, and codes of practice, the MMA Guidelines, the Content Standards, and all Carrier guidelines with respect to the content routing services, text messaging in general and otherwise in connection with performing its obligations under the Service Agreement. [Exhibit F, mGage 0069].

37.     Under the Service Agreement, MMA Guidelines means, "The Mobile Marketing Association's Consumer Best Practices Guideline and Privacy Code of Conduct established from time to time, including as maintained at http://mmaglobal.com/bestpractices.pdf, which are incorporated" into the Service Agreement by the reference therein contained.  [Exhibit F, mGage 0060]

38.     A link to the MMA guidelines was set forth in the Service Agreement. [Exhibit F, mGage 0060]

39.     Under the Service Agreement, Opera agreed to "adhere to the Content Standards, and any changes to the Content Standards required by the Carriers from time to time, and agrees that no Content shall violate the Content Standards. [Exhibit F, mGage 0070].

40.     Under the Service Agreement, Content Standards means, "Standard which describe the types of Content that Company may not send to Subscribers and the means and circumstances by which Company may send Content to Subscribers. For purposes of this agreement, the Content Standards include, without limitation, (a) Company's mandatory compliance with all Carrier Application Form filings (and/or other campaign/program representations made during any similar provision approval process) as approved by the respective Carriers, and (b) the Content Standards currently established by the Carriers as of the Effective Date which are set forth on Schedule E [of the Service Agreement], and any additions, deletions or changes to the current Content Standards that are hereafter announced from time to time. [Exhibit F, mGage 0060].

41.     Under the Service Agreement, Subscribers means, "Any and all persons who have Interactive Wireless Devices capable of receiving Content and who have

subscribed to send and receive Content via the Advanced Messaging Platform through the Carrier(s). [Exhibit F, mGage 0060].

42.     Under the Service Agreement, Opera agreed, "not to send Content that requires a Third Party's consent unless it has obtained that consent in writing." [Exhibit F, mGage 0070].

43.     Under the Service Agreement, Opera agreed to, "comply with, and be solely responsible for compliance with all "opt-in" and "opt-out" requirements for received messages (including Content) under all applicable laws, Content Standards, and MMA Guidelines.   [Opera] shall provide a short code response, website, and customer care email in which Subscribers can indicate to [Opera] whether they wish to receive or cease receiving Content.   For example, a response of "stop" to a text message would mean that the subscriber has "opted out" and should no longer receive text messages from [Opera].   [Opera] shall immediately comply with any Subscriber request to cease receiving Content.   [Opera] shall provide contract information (at a minimum an email address) for Company's customer service at the same time and in a noticeable location (i.e. on the same web page or in the same SMS) as Subscribers register for [Opera's] text messaging services. [Exhibit F, mGage 0071].

44.     Under the Service Agreement, Opera represented, warranted, and covenanted to mGage that, "the Content(s) will comply with the law, Content Standards, and the MMA Guidelines." [Exhibit D, mGage 0071].

45.     Under the Service Agreement, Opera represented and warranted to mGage that, "it will not use the Content Routing Services in violation of the law, Content Standards or MMA Guidelines to engage in any spamming, mail-bombing, spoofing or any fraudulent, illegal, unauthorized, or improper use." [Exhibit F, mGage 0071].

**mGage's Technology**

46.     The platform service offered by mGage is a software system as well as a web-based service.  [Exhibit E, Deposition of Harvey Scholl, p. 17].

47.     mGage helps its clients connect to an end user's cell phone by handling the connection between the client and the carrier. [Exhibit E, Deposition of Harvey Scholl, p. 11].

48.     To connect its clients to the carriers, mGage uses technology which utilizes the SMPP Protocol. [Exhibit E, Deposition of Harvey Scholl, p. 11].

49.     SMPP is a protocol by which SMS messages are passed between short message service centers ("SMSC"). [Exhibit E, Deposition of Harvey Scholl, p. 11].

50.     Businesses need to obtain a short code in order for the carriers to accept their messages into their SMSCs.  [Exhibit E, Deposition of Harvey Scholl, p. 16].

51.     As part of its services, mGage obtains short codes on behalf of its customers, which entails registering them with the different carriers. [Exhibit E, Deposition of Harvey Scholl, p. 16].

52.     A short code is an address from which Application to Peer (A2P) SMS messages are received from or set to. [Exhibit E, Deposition of Harvey Scholl, pp. 48-49].

53.     mGage's Platform is the gateway by which it connects to the carrier's SMSCs.  [Exhibit E, Deposition of Harvey Scholl, p. 14].

54.     The Platform does not have the capacity to produce or store telephone numbers to be called using a random or sequential number generator. [Exhibit G, Declaration of Harvey Scholl, ¶ 4]

55.     The Platform cannot, in connection with other equipment or on its own accord, generate any telephone numbers, be they random, sequential, or otherwise, to receive calls or text messages.  [Exhibit G, Declaration of Harvey Scholl, ¶ 5]

56.     Once the carrier receives the text message, it places the text message on the SS7 network, where cell phones' SMS applications await messages to be received. [Exhibit E, Deposition of Harvey Scholl, p. 12].

57.     The carrier is the party that ultimately delivers the text message to individual recipients. [Exhibit E, Deposition of Harvey Scholl, p. 12].

**Opera's interactions with the mGage System**

58.     Opera had two staff members whose responsibilities, at least in part, included sending text messages to Opera's customers—Rosanna Penaflorida and Casey Rupplet.  [Exhibit D, Deposition of Russell Green, p.11].

59.     Russell Green, Rosanna Penaflorida, and Opera's then "IT guy" Dirk Ringursma attended a training where they learned how to log into the Platform, and how to compose and send SMS messages at Air2Web's office.  [Exhibit D, Deposition of Russell Green, p. 17-19, Exhibit H, Deposition of Rosanna Penaflorida, p. 10-11].

60.     Rosanna Penaflorida worked at Opera at all times relevant to this lawsuit.  [Exhibit H, Deposition of Rosanna Penaflorida, pp. 6-7].

61.     From around 2010 until at least the beginning of 2014, Penaflorida held the position of Director of Marketing and Promotions at Opera. [Exhibit H, Deposition of Rosanna Penaflorida, p. 7].

62.     As Director of Marketing and Promotions, Penaflorida was responsible for creating and executing various marketing campaigns for Opera. [Exhibit H, Deposition of Rosanna Penaflorida, p. 7-8].

63.     Penaflorida created and sent out promotional text messages to Opera's customers using mGage's Platform.     [Exhibit H, Deposition of Rosanna Penaflorida, pp. 8-9].

64.     To access mGage's Platform, an Opera employee such as Penaflorida would have to go to a website to log into mGage's platform. [Exhibit H, Deposition of Rosanna Penaflorida, pp. 12-13, Exhibit D, Deposition of Russell Green, pp. 18-19].

65.     Opera was able to log onto mGage's web-based platform at its own office and/or facility. [Exhibit E, Deposition of Harvey Scholl, p. 17].

66.     Individuals at Opera could enter data into the gateway platform by punching in numbers and messages.  They could also upload CSV files. [Exhibit E, Deposition of Harvey Scholl, p. 17].

67.     Opera controlled the content of each text message sent. [Exhibit D, Deposition of Russell Green, p. 20; Exhibit E, Deposition of Harvey Scholl, p. 18, Exhibit H, Deposition of Rosanna Penaflorida, p. 42].

68.     Opera employees would discuss the content of the text messages at a weekly meeting.  [Exhibit D, Deposition of Russell Green, p. 23].

69.    Penaflorida would draft the content of the text messages and show them to Russell Green for final approval.   [Exhibit H, Deposition of Rosanna Penaflorida, p. 9-10].

70.    There was a content box on the platform where Opera's employees could type in the content of the message directly into the Platform.   [Exhibit H, Deposition of Rosanna Penaflorida p. 13, Exhibit D, Deposition of Russell Green, p. 31].

71.    The platform allowed the user to choose when to send out text messages. [Exhibit D, Deposition of Russell Green, p. 24].

72.    Penaflorida testified, "I would either send the message immediately or send it within a couple of hours of creating it". [Exhibit H, Deposition of Rosanna Penaflorida, p. 14].

73.    If Opera wanted to send a text message immediately, Rosanna Penaflorida would click "send".   [Exhibit H, Deposition of Rosasna Penaflorida, pp. 14-15].

74.    If Opera wanted to schedule a later date and time at which a text message should be sent there was a drop-down calendar function where Rosanna could select a specific day and time. [Exhibit H, Deposition of Rosanna Penaflorida, p. 15, Exhibit D, Deposition of Russell Green, p. 24].

15

75.    The Platform can only route an SMS Message at the customer's affirmative direction.  It could not be configured to transmit messages without the intervention of a human to create the content of the message and to instruct the platform to route the message either immediately or in the future at a particular date and time.  [Exhibit G, Declaration of Harvey Scholl, ¶ 6].

76.    Opera determined the telephone numbers to which text messages were sent.  [Exhibit D, Deposition of Russell Green, p. 20; Exhibit E, Deposition of Harvey Scholl, p. 19; Exhibit H, Deposition of Rosanna Penaflorida, pp. 15-16].

77.    Opera determined the telephone number to which text messages would be sent by choosing a particular list that was housed on mGage's platform. [Exhibit D, Deposition of Russell Green, p. 20; Exhibit H, Deposition of Rosanna Penaflorida, pp. 15-16].

78.    Opera would upload the list of numbers would be uploaded to mGage's a web-based tool on mGage's platform as a Common Separated Values "CSV" File. [Exhibit E, Deposition of Harvey Scholl, p. 19-21].

79.    A CSV file is a flat text file.  [Exhibit E, Deposition of Harvey Scholl, p. 20].

80.    Numbers for these lists would be obtained either through inbound campaigns or other opt-in scenarios. [Exhibit D, Deposition of Russell Green, p. 20].

81.     In an inbound campaign, Opera would run a promotion asking individuals to text a certain keyword or phrase to Opera's short code 67372.  When the person texted in that keyword or phrase, their number would be added to the list that corresponded with that campaign.  [Exhibit D, Deposition of Russell Green, p. 21, Exhibit H, Deposition of Rosanna Penaflorida, pp. 16, 20].

82.     Each keyword or phrase was a different list so the customer could sign up and get information about events.  [Exhibit H, Deposition of Rosanna Penaflorida, pp. 20-21, 26]

83.     Examples of lists included one for college night, one for Thursday nights, one for electronic nights, and one for ladies' nights.  [Exhibit H, Deposition of Rosanna Penaflorida, p. 27].

84.     Opera could then download the list containing the additional numbers obtained through participation in the campaign and add it to their master list and re-upload it. [Exhibit E, Deposition of Harvey Scholl, p. 19].

85.     Individuals could also have their number added to a list by entering their telephone number on Opera's website or on a guest list form.  Opera would then manually upload the telephone numbers to the platform. [Exhibit D, Deposition of Russell Green, p. 21, Exhibit G, Deposition of Rosanna Penaflorida, pp. 46-47].

86.    A person had to opt in to receive text messages before a text message could be sent to them by Opera.  [Exhibit D, Deposition of Russell Green, p. 24-25].

87.    The Platform can only route an SMS Message to a telephone number that has been uploaded to its platform through human curation and intervention. It cannot be configured to send messages to random or sequential numbers that had not been uploaded to the platform by a human. [Exhibit G, Declaration of Harvey Scholl, ¶ 7]

88.    Opera was responsible for making sure that people to whom text messages were sent actually gave permission to receive text messages.  [Exhibit D, Deposition of Russell Green, pp. 25-26].

89.    Once Opera entered the necessary data into the platform, Opera would have to press send or schedule a date and time when the message would be sent. [Exhibit E, Deposition of Harvey Scholl, p. 25].

90.    Opera determined the date and time that text transmissions would be sent by entering the date and time at which they wish for a transmission to begin on the web-based platform. [Exhibit E, Deposition of Harvey Scholl, p. 25].

91.    Once send had been pressed or the scheduled date and time arrives, the mGage platform then takes the message to be send and routes it to the appropriate carriers. [Exhibit E, Deposition of Harvey Scholl, p. 18].

92.     At no point throughout the process does the mGage system dial any numbers.  [Exhibit E, Deposition of Harvey Scholl, p. 21].

93.     If a number needed to be removed from a list, Opera controlled that process. [Exhibit E, Deposition of Harvey Scholl, p. 22].

94.     To remove a number, Opera could receive a response text that began with the specific syntax in order for the text messages to cease being sent to that telephone number. [Exhibit E, Deposition of Harvey Scholl, p. 22].

95.     Opera did not include instructions to inform recipients how to get Opera's text messages to stop in the body of the text messages from July of 2010 through May of 2014.  [Exhibit D, Deposition of Russell Green, pp. 29-30; 55-56].

96.     Opera did not include instructions for how to opt out of its promotional text messages on its website during the relevant time period.  [Exhibit H, Deposition of Rosanna Penaflorida, p. 35]

97.     The content of the text messages was exclusively Opera's responsibility. [Exhibit E, Deposition of Harvey Scholl, p. 18].

98.     If a message came in with "stop", "end", "cancel", "unsubscribe", or "quit" as the first word in the message, mGage would mark a record in mGage's tool as unsubscribed, which would then be shared with Opera. [Exhibit E, Deposition of Harvey Scholl, p. 37].

99.   Russell Green believed that if a text recipient replied "stop" that that individual would automatically stop receiving text messages. [Exhibit D, Deposition of Russell Green, pp. 27-29].

100.   Rosanna Penaflorida testified that Opera had the ability to remove a telephone number from a list by typing in the number manually.   [Exhibit H, Deposition of Rosanna Penaflorida, pp. 16-17]

101.   If anyone asked an Opera employee about how to stop receiving Opera's text messages, they would be told to reply "stop" to end the messages.   [Exhibit D, Deposition of Russell Green, pp. 48-49].

102.   Opera received about two to five calls per week from individuals inquiring as to how to opt out of Opera's promotional text messages.   [Exhibit H, Deposition of Rosanna Penaflorida, pp. 49-50]

103.   Opera was responsible for ensuring that numbers stop receiving text messages. [Exhibit F, Deposition of Harvey Scholl, p. 37].

104.   Russell Green testified that Opera would continue to send messages in response to being asked whether Opera would continue to send messages to the telephone number of a person who had replied back asking to please stop all messages. [Exhibit D, Deposition of Russell Green, p. 41].

105.   [RESERVED]

106.   [RESERVED].

107.   It would have been a nearly impossible task for mGage's program to be set up so that it could respond to reply messages that did not start with "stop", "end", "cancel", "unsubscribe", or "quit". [Exhibit E, Deposition of Harvey Scholl, p. 38].

108.   To set up the mGage program to respond to reply messages that did not start with "stop", "end", "cancel", "unsubscribe", or "quit" it would have had to be hard-coded to respond to texts starting with a specific change of two or more words. [Exhibit E, Deposition of Harvey Scholl, p. 38].

109.   [RESERVED]

110.   The mGage platform could not be configured to automatically respond to a text messaged containing the word "stop", "end", "cancel", "unsubscribe", or "quit" if it appeared within a reply text, but was not the first word.   [Exhibit E, Deposition of Harvey Scholl, pp. 38-39].

**Reassigned Numbers**

111.   mGage has no way no know whether a telephone number has been reassigned  unless the carrier of that number follows the SMPP Protocol. [Exhibit E, Deposition of Harvey Scholl, p. 30].

112.   Under the SMPP Protocol, the carrier would notify mGage of any changes in number ownership or reassigned numbers. [Exhibit E, Deposition of Harvey Scholl, p. 30].

113.   Once a carrier had notified mGage, it would notify Opera of any reassigned numbers. [Exhibit E, Deposition of Harvey Scholl, p. 29-30].

114.   mGage would generally make lists of reassigned numbers submitted to it by one of the carriers available for download by the client via FTP or via simple file transfer protocol. [Exhibit E, Deposition of Harvey Scholl, p. 85].

115.   If mGage has instructions of where to send lists of reassigned numbers it will also send the list. [Exhibit E, Deposition of Harvey Scholl, p. 85].

116.   Not all carriers follow the SMPP Protocol with regard to informing mGage about changes in number ownership or reassigned numbers. [Exhibit E, Deposition of Harvey Scholl, p. 30].

117.   MetroPCS was not one of the carriers that would notify mGage when numbers were reassigned.  [Exhibit G, Declaration of Harvey Scholl, ¶ 8]

**Jenkins' Experience with Opera and Subsequent Lawsuit Against Opera and mGage.**

118.   On September 26, 2012, someone used the mobile device then assigned the number (404) ***-2763 to text the word "college" to Opera's short code.  [Exhibit I, mGage 0084; Exhibit E, Deposition of Harvey Scholl, p. 47;

Exhibit D, Deposition of Russell Greene, p. 36-37; Exhibit H, Deposition of Rosanna Penaflorida, p. 32.]

119.   The telephone number (404) ***-2763 was reassigned to Collette Jenkins on or around April of 2013. [Exhibit A, Deposition of Collette Jenkins, p. 37].

120.   At all times material to this lawsuit, Collette Jenkins was a MetroPCS customer.  [Exhibit A, Deposition of Collette Jenkins, Defendant's Exhibit 1].

121.   In approximately August of 2013, Jenkins began receiving text messages from Opera's short code 67372 advertising Co-Defendant Opera's upcoming events to her cellular telephone number (404) ***-273. [Docket No. 11-1, Amended Complaint, ¶ 16; Exhibit A, Deposition of Collette Jenkins, pp. 55-56].

122.   Jenkins continued to receive text messages from Opera's short code that advertised Opera's events from August of 2013 until midway through July of 2014. [Exhibit J, mGage 0001-0058 and 0092-0097].

123.   Jenkins sent multiple response texts asking to be removed from Opera's promotional text message list.  [Exhibit J, mGage 0001-0058 and 0092-0097].

124.   On July 14, 2014, Jenkins responded "STOP TEXT" to Opera's short code. [Exhibit J, mGage0097].

125.   The final message from Opera's short code that Jenkins received stated, "You have been opted out of Opera Nightclub Alerts and will no longer receive messages from us. Reply HELP for help. Msg&Data rates may apply." [Exhibit J, mGage 0097].

126.   On August 28, 2014, Jenkins filed this lawsuit against Opera [Docket No. 1, Complaint].

127.   On December 1, 2014, Jenkins amended her complaint to add mGage as a defendant in this lawsuit. [Docket No. 11-1; Amended Complaint].

128.   Paragraph 12 of the Factual Allegations of Plaintiff's Amended Complaint alleged that, mGage, LLC was hired as Opera's agent for the purpose of sending, on behalf of Co-Defendant Opera unsolicited text messages to cellular phones. [Docket No. 11-1; Amended Complaint, ¶ 12].

129.   Throughout the Amended Complaint, Jenkins classified the texts Opera and mGage allegedly sent to Plaintiff as "autodialer text messages". [Docket No. 11-1; Amended Complaint, ¶¶ 23, 27-30, 34-36, 39-40].

130.   Paragraph 17 of the Amended Complaint alleged that, "All of the text messages complained of herein were sent by Defendant, OPERA, or by its

authorized agent and vendor, Defendant, mGage, LLC, acting on behalf of Defendant, OPERA.  [Docket No. 11-1; Amended Complaint, ¶ 17.

## Jenkins' Previous Claims and Lawsuits

131.   Plaintiff and her siblings were paid $700,000 as a mediated settlement in a wrongful death suit filed following her mother's death in 2005.  [Exhibit A, Deposition of Collette Jenkins pp. 11-12,176-179].

132.   Sometime between 2007 and 2008, Plaintiff sued Target for an injury she sustained after she broke her toe on a sign in a target parking lot. .  [Exhibit A, Deposition of Collette Jenkins 12-14].

133.   Target paid Plaintiff $14,000 and reimbursed her for her medical expenses to settle the suit.  [Exhibit A, Deposition of Collette Jenkins pp. 13-14, 179-180].

134.   Plaintiff has also received two payouts of $11,000 and $14,000, respectively, from her apartment complex after the complex's elevator dropped between floors while the plaintiff was inside.  [Exhibit A, Deposition of Collette Jenkins, pp. 14-15; 180-181].

135.   Jenkins testified that she stopped working as a clerk for the City of Atlanta in 1991 and thereafter began receiving disability payments due to

workplace back injuries sustained in 1983 and 1991, respectively. [Exhibit A, Deposition of Collette Jenkins, pp. 26-29, 181-183].

136. Opera never received any information regarding the reassignment of the handset at issue and thus had no knowledge regarding the reassignment of cell phone number 404-***-2763 to Plaintiff. Exhibit D, Deposition of Russell Greene, p. 33, Exhibit H, Deposition of Rosanna Penaflorida, p. 42-43].

137. Plaintiff did not place a single phone call or write a single e-mail or letter to Opera to request removal from its marketing list. Exhibit A, Deposition of Collette Jenkins, pp. 87-89]. Instead, she continued to send the same message using the copy/paste function on her phone. [*Id*., p. 62-63]. She knew that these reply text messages were ineffective, yet instead of attempting to contact Opera directly, she hired counsel specializing in TCPA litigation. [*Id*., p. 89]

138. mGage's Platform opts-out a recipient of text messages when that recipient sends a reply text message that *begins* with the word, "stop," "end," "cancel," or "unsubscribe" (each an "Opt-Out Keyword"). [Exhibit F, Deposition of Harvey Scholl, pp. 23-24, 36-37, 74. If an Opt-Out Keyword does not appear as the first word in the text message, then it will not be flagged as "unsubscribed" in mGage's system. [Id., p. 37]. And if the message is not flagged, there is no way of

26

knowing that the recipient is attempting to opt-out unless that person were to call. [Id., p. 37].

139.   Opera was completely unaware of whether it had the ability to receive and view any such reply text messages from recipients. [Exhibit D, Deposition of Russell Greene, pp. 41-42, 45-46, 50-51; Exhibit H,  Deposition of Rosanna Penaflorida, pp. 33-34, 42-43].

140.   When  Plaintiff  replied  with  "STOP  TEXT,"  the  Platform automatically sent her an opt-out response, and she ceased receiving messages. [Exhibit A, Deposition of Collette Jenkins, p. 75].

141.   Plaintiff engaged counsel no later than April 2014 after viewing a Morgan and Morgan television ad regarding unwanted text messages and the TCPA. [Exhibit A, Deposition of Collette Jenkins, p. 42, 81-82, 89].

142.    "Opt-out" instructions were included on Opera's text messages as of May 27, 2014; however, Plaintiff allowed 11 messages to come in after this date. "[Plaintiff admits that she] wasn't reading the messages…[she] just let them pile up." [Exhibit A, Deposition of Collette Jenkins, p. 77: 8-10; Exhibit J].

143.   Plaintiff knew that her telephone number was reassigned because she had several "wrong number" phone calls in the first several months of purchasing her phone.  When she told these people to stop calling and/or texting, they stopped.

She notably did not follow the same protocol with Opera. [Exhibit A, Deposition of Collette Jenkins, p 46].

144.   Plaintiff has subsequently agreed not pursue her claim for emotional distress, as indicated in the email correspondence dated July 29, 2015 [Exhibit K].

This 21st day of September, 2015.

Respectfully submitted by:


/s/ Lauren M. Simons
Peter F. Schoenthaler
Georgia Bar No. 629789
Lauren M. Simons
Georgia Bar No. 410927
SCHOENTHALER LAW GROUP
400 Interstate N. Parkway, Suite 1500
Atlanta, Georgia 30339
pfs@pfslawgroup.com
lms@pfslawgroup.com
Tel:   (404) 855-3315
Fax:   (404)891-6120

*Attorneys for Defendant mGage, LLC*


/s/ Hayden Pace
Hayden R. Pace
Georgia Bar No. 558595
Jordan D. Arkin
Georgia Bar No.180796
STOKES, WAGNER, HUNT, MARETZ & TERRELL, A.L.C.
One Atlantic Center, Suite 2400

1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
hpace@stokeswagner.com
jarkin@stokeswagner.com
Tel:   (404) 766-0076
Fax:   (404)766-8823

*Attorneys for Defendant LL Atlanta, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 21st, 2015, I electronically filed Defendants' Corrected Statement of Material Facts in Support of Defendants' Motion for Summary Judgment, or in the Alternative, Motion for Partial Summary Judgment on Intentionality with the Clerk of Court using the CM/ECF system and via email pursuant to agreement by the parties to the following attorneys of record:

> Madeleine N. Simmons, Esq.
> Morgan & Morgan Atlanta, PLLC
> 191 Peachtree Street, Suite 4200
> P.O. Box 57007
> Atlanta, GA 30343
> Tel: 404.965.8811
> Fax: 404.965.8812
>
> Michael J. Vitoria, Esquire
> *Admitted Pro Hac Vice*
> Morgan & Morgan, Tampa, P.A.
> One Tampa City Center Tampa, FL 33602
> Tel: (813) 223-5505
> Fax: (813) 223-5402
> MVitoria@ForThePeople.com
> afloyd@forthepeople.com
>
> *Counsel for Plaintiff*

Dated:  September 21st, 2015          /s/ Lauren M. Simons
                                      Lauren M. Simons